## State v. Lawson
[Cite as 4 AOA 516]

*Case No. CA88-05-044*
*Clermont County, (12th)*
*Decided June 4, 1990*

*Donald W. White, Clermont County Prosecuting Attorney, Timothy E. Schneider and David H. Hoffmann, 123 N. Third Street, Batavia, Ohio 45103, for Plaintiff-Appellee.*

*Moore, Moore & Moore, John K. Daggett, 1095 Nimitzview Drive, Cincinnati, Ohio 45230, and Rosenhoffer, Nichols & Schwartz, Peter J. Strasser, 250 E. Main Street, Batavia, Ohio 45103, for Defendant-Appellant.*

*Per Curiam.*

This cause came on to be heard upon an appeal, transcript of the docket, journal entries and original papers from the Clermont County Court of Common Pleas, transcript of proceedings, briefs and oral arguments of counsel.

Now, therefore, the assignments of error having been fully considered are passed upon in conformity with App. R. 12(A) as follows:

On September 23, 1987, defendant-appellant, Jerry R. Lawson, shot and killed Timothy Martin in retaliation for allegations made by Martin implicating appellant and his brother, Timothy Lawson, in a number of criminal activities, including two separate residential burglaries in Owensville, Ohio. Martin, who had been acting as a police informant, had testified before the Clermont County Grand Jury and was expected to testify at the Lawson's trial of the burglary charges.

According to the record, the Lawsons met with William Payton and his sister, Sue Payton, and discussed the various allegations and statements made by Martin. During this discussion,

appellant persuaded William Payton to contact Martin and tell him that he knew of marijuana field that could be raided. Martin agreed to meet with Payton and the Lawsons near the Bella Vista apartments in Batavia. Appellant then drove along back roads through Clinton and Brown Counties before stopping near an old barn in a secluded portion of Highland County. The four men exited the vehicle and walked a short distance into a nearby woods, ostensibly to look for the marijuana field. There, appellant pulled out a .32 caliber handgun and fired several shots at Martin, striking him once in the back. Martin fell to the ground and pleaded with appellant to take him to a hospital. Appellant, however, verbally harangued Martin about being a "snitch," then offered him a knife to "put [himself] out of [his] misery." When Martin declined, appellant began kicking and beating him about the head and ribs. Appellant continued to physically and psychologically torment Martin until he died approximately forty-five minutes later.

After Martin died, appellant ordered his brother and Payton to drag the body to a hole next to a fallen tree where they covered the body with bark and debris. Before leaving the area, appellant turned the gun on Payton and threatened to kill him and his family if he went to the authorities.

On September 25, 1987, Payton met with special agent Larry Watson of the F.B.I., with whom he had prior contact on an unrelated narcotics matter, and informed him of the Martin killing. Thereafter, Payton and his sister cooperated with the police and obtained surreptitious taped statements from appellant in which he described in detail how and why he killed Martin.

Appellant was subsequently indicated on two counts of aggravated murder, three counts of kidnapping, two counts of intimidation, aggravated robbery, aggravated burglary, and gross abuse of a corpse. All counts with the exception of the gross abuse of a corpse charge carried specifications. Appellant initially pleaded not guilty, but later charged his plea to not guilty by reason of insanity after stipulating that he had shot and killed Martin.

On April 26, 1988, a jury found appellant guilty of two counts of aggravated murder, two counts of kidnapping, two counts of intimidation, aggravated burglary, and the attendant specifications. Following a mitigation hearing, the jury recommended that appellant be sentenced to death on the aggravated murder charges. The trial court accepted this recommendation and further concurrent sentences of ten to twenty-five years imprisonment on the kidnapping charges. These sentences were to run consecutively to sentence of four to ten years and two years respectively on the intimidation charges, ten to twenty-five years on the aggravated burglary charge, the three years actual incarceration on a firearm specification. The matter is now before this court on an appeal as of right, with appellant challenging his conviction and sentence as follows:

*First Assignment of Error*

"The trial court erred to the prejudice of the defendant-appellant by refusing to grant a mistrial based on prosecutorial misconduct."

*Second Assignment of Error*

"The trial court erred to the substantial prejudice of the defendant-appellant in failing to either *sua sponte* order a mistrial or to give specific curative instruction where the prosecutor in closing argument in the penalty phase of a capital case urged the jury to consider matters clearly outside the bounds of its proper purview and patently inflammatory in content. Alternatively, defendant-appellant submits that such comments were plain error and upon review require reversal and vacation of the sentence of death."

*Third Assignment of Error*

"The trial court erred to the prejudice of the defendant-appellant by allowing taped conversations between the defendant-appellant and other individuals to be taken into the jury room when only portions of the taped conversations were played in open court."

*Fourth Assignment of Error*

"The defendant-appellant was denied effective assistance of counsel when his appointed counsel failed to object to the jury's having access to unedited taped conversations and admissions of the defendant-appellant."

*Fifth Assignment of Error*

"Defendant-appellant was denied effective assistance of counsel when his appointed counsel failed to move for exclusion of those portions of taped conversations between the defendant-appellant and a third party containing references to his having 'killed before.'"

*Sixth Assignment of Error*

"The trial court erred to the substantial prejudice of the defendant-appellant in refusing his counsel's motion to argue first and last at the mitigation phase of the trial."

*Seventh Assignment of Error*

"The decision of the state to forego prosecution of co-conspirators, Billy Payton and Sue Payton, worked a denial of equal protection to the defendant-appellant and, effectively, denied him due process and the effective assistance of his counsel."

*Eight Assignment of Error*

"The trial court's failure to order the state to disclose in full the results of its interview of the co-conspirators, Payton, to the defense and the trial court's failure to conduct a pre-trial in-camera review of the state's file as it pertained to the co-conspirators, Payton, constituted prejudicial error."

*Ninth Assignment of Error*

"The trial court erred to the substantial prejudice of the defendant-appellant in refusing to order the unsealing of the prosecutor's notations of his interviews with co-conspirators for purposes of review on appeal where the state had agreed to such during pretrial discovery efforts to determine the existence of evidence of 'Brady material.'"

*Tenth Assignment of Error*

"The findings of the jury that the defendant-appellant was the principal offender was, in view of the uncontroverted evidence of his low level of the intelligence and in view of the leading roles in the formulation of the conspiracy played by Sue Payton and Billy Payton and in view of the fact that Billy Payton was the primary activist in bringing the plot to fruition, error."

*Eleventh Assignment of Error*

"The trial court erred the prejudice of appellant by denying appellant's challenges to the constitutionality of the death penalty and in sentencing appellant to death, for the reason that the Ohio capital punishment statutes are unconstitutional, denying to appellant the right to due process of law and to the equal protection of the law, and the right to be free from cruel and unusual punishments secured to him by the Eighth and Fourteenth Amendments to the Constitution of the United States, and to the prohibition against cruel and unusual punishment and the guarantees of due course of law and equal protection under the Ohio Constitution, in that:

"(A) The death penalty is so totally without penological justification that it results in the gratuitous infliction of suffering, and that consequently, there is no rational state interest served by the ultimate sanction.

"(B) The requirement that a jury must recommend death upon proof beyond a reasonable doubt that the aggravating circumstances outweigh only to the slightest degree the mitigating circumstances renders the Ohio capital statutes quasi-mandatory and permits the execution of an offender event though the mitigating evidence falls just short of equipoise with the aggravating factors, with the result that the risk of putting someone to death when it is practically as likely not that he deserves to live renders the Ohio capital process arbitrary and capricious, and in the absence of a requirement that, before death may be imposed, aggravating factors must *substantially* outweigh mitigating factors, unconstitutional.

"(C) The Ohio capital statutes are constitutionally infirm in that they do not permit the extension of mercy by the jury even though aggravating factors outweigh mitigation factors.

"(D) The provisions of Crim. R. 11(C) (3) permitting a trial court to dismiss specifications upon a guilty plea only under the nebulous and undefined concept 'in the interests of justice' (1) needlessly encourages guilty pleas and the concomitant waiver of the right to jury, to compulsory process and to confrontation and (2) reintroduces the possibility that the death sentence will be imposed arbitrarily and capriciously.

"(E) The Ohio capital sentencing scheme is unconstitutional because it provides no stand ards for sentencing or review at several significant stages of the process and consequently death sentences are imposed, and reviewed, without sufficient statutory guidance to juries, trial courts and reviewing courts to prevent the unconstitutional arbitrary and capricious infliction of the death penalty."

*Twelfth Assignment of Error*

"The trial court erred to the substantial prejudice of defendant-appellant in refusing to give his requested charge on reasonable doubt."

*Thirteenth Assignment of Error*

"The trial court erred to the substantial prejudice of the defendant-appellant in charging on specification No. Two to Court One of the indictment."

*Fourteenth Assignment of Error*

"The trial court erred to the substantial prejudice of the defendant-appellant in overruling his objection to specification Number Two of Count Two."

*Fifteenth Assignment of Error*

"The failure of the state to record the grand jury proceedings out of which arose the indictment charging defendant below constitutes error prejudicial to the defendant-appellant."

## I.

Appellant's first assignment of error alleges prosecutorial misconduct during closing arguments in the penalty phase of appellant's trial.

As a general rule, the prosecutor is granted considerable latitude during closing argument. *State* v. *Maurer* (1984), 15 Ohio St. 3d 239, 260, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714. In determining whether prosecutorial remarks constituted reversible error, the test is whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. *State*. v. *Brown* (1988), 38 Ohio St. 3d 305, 316, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1177; *State* v. *Smith* (1984), 14 Ohio St. 3d 13, 14. Further, "it is not enough to find that the comments were inappropriate or even universally condemned. * * * The relevant question is whether they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *State* v. *DePew* (1988), 38 Ohio St. 3d 275, 287, certiorari denied (1989), ___ U.S. ___, 109 S.Ct 1099, quoting *Donnelly* v. *DeChristoforo* (1974), 416 U.S. 637, 643, 94 S.Ct. 1868, 1871.

In the case at bar, appellant objected to the following comments:

"Now, we heard from the defendant's mother. And, you know, this is very uncomfortable for me to speak about because I think you, just like I have, have watched the vigil that woman has kept for well going on to 40 days now. She quietly sat back there and supported this man. And I can't help and I haven't been able to help for 40 days to think about my own mother and when my father died and I watched her suffer and more so than me grieving over the death of my father, I watched my mother suffer and that hurt. And when she took that stand I hurt for Mrs. Lawson, and you can't deny there is anyone that wasn't affected, and I saw a number of you cry and because I'm out here and I'm an attorney and this is my business I fought back the tears and I swallowed hard and there was only one person in this courtroom who didn't and it's that man right there. And if anybody took time to look over at him like I did and saw the reaction that he had to his own mother on that stand, it was chilling. And I want to carry that with you when you weigh the aggravating circumstances versus the mitigating factors * * *."

Appellant asserts that the foregoing remarks constituted an improper comment upon his demeanor and infringed upon his right to remain silent and not testify at trial. We disagree. The Ohio Supreme Court has held that a defendant's face and body are physical evidence and the prosecution may comment on the accused's appearance. *Brown, supra,* at 317. Further, the remarks were not such as to implicate appellant's right to remain silent or deprive him of a fair trial. See *State* v. *Thompson* (1987), 33 Ohio St. 3d 1.

Appellant also contends that the foregoing comments represented an impermissible appeal to the passions of the jury. We agree that the prosecutor's reference to his own mother and his personal feelings was inappropriate as it related to irrelevant matters outside the record. *Smith, supra; State* v. *Liberatore* (1982), 69 Ohio St. 2d 583. However, we find that appellant incurred no prejudice as a result of these remarks. The trail court immediately issued a cautionary instruction and reminded the jury that the arguments of counsel were not evidence. Accordingly, appellant's first assignment of error is overruled.

## II.

Appellant's second assignment of error also alleges prosecutorial misconduct during closing arguments of the penalty phase. Specifically, appellant argues that the prosecution improperly urged the jury to consider the heinous nature of the offense as a separate aggravating circumstance. The prosecutor stated:

"* * * And let's consider the mitigation hearing [Tim Martin] got in the back of that cornfield on September 23, 1987, when he wasn't too proud to beg for his life. And nobody stepped forward to help him and one man kicked him in the head like a football until he quit breathing. So, consider that for whatever mitigation you might want to and finally consider what this man told Dr. Lutz, 'If I had the chance I would do it again.' Consider that in mitigation."

The record discloses that appellant did not object to the foregoing remarks or request a cautionary instruction. Therefore, any error relative thereto could be deemed waived. *State* v. *Williams* (1977), 51 Ohio St. 2d 112. However, in the ,interest of justice, we will review appellant's argument.

R.C. 2929.04(B) provides:

"(B) If one or more of the aggravating circumstances listed in division (A) of this section is specified in the indictment or count in the indictment and proved beyond a reasonable doubt, * * * the court, trial jury, or panel of three judges *shall consider,* and weigh against the aggravating circumstances proved beyond a reasonable

doubt, *the nature and circumstances of the offense,* * * *." (Emphasis added.)

Thus, the court or jury is *required* to consider the nature and circumstances of the offense in balancing the aggravating circumstances and mitigating factors. *State* v. *Stumpf* (1987), 32 Ohio St. 3d 95, 99, certiorari denied (1988), ___ U.S. ___, 108 S.Ct 1060; *State* v. *Steffen* (1987), 31 Ohio St. 3d 111, 116-117, certiorari denied (1988), ___ U.S. ___, 108 S.Ct 1089. Naturally, the nature and circumstances of a particular offense may offer little or nothing in the way of mitigation. Such is the case at bar. It is evident from the record that by reviewing the gruesome and vicious nature of the murder, the prosecution was merely asserting its position that no mitigation could be extracted from the nature and circumstances of this particular offense. Such an argument is entirely within the bounds of R.C. 2929.04(B). *Steffen, supra,* at 117; *State* v. *Byrd* (1987), 32 Ohio St. 3d 79, 81, certiorari denied (1988), ___ U.S. ___, 108 S.Ct 763. Appellant's second assignment of error is overruled.

### III.

For his third assignment of error, appellant asserts that the trial court erred in allowing tape recordings to be taken to the jury room when only portions of those tape recordings were played in open court. We find no merit to this argument.

In *State* v. *Fellows* (1975), 47 Ohio App. 2d 154, the Marion County Court of Appeals held that it was not prejudicial error to allow the jury to review a properly admitted video tape during deliberations. The court noted that "[i]t is common practice to send exhibits admitted into evidence to the jury room. * * * Once in the jury room, the exhibits may be examined by the jury to any extent it desires." *Id.* at 158-159. In *State* v. *Clark* (1988), 38 Ohio St. 3d 252, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1355, the Ohio Supreme Court quoted *Fellows* and held that it was not an abuse of discretion to allow an audio tape admitted into evidence to be taken into the jury room. *Id* at 257.

Our initial inquiry, then, must address the propriety of admitting the particular tape recordings in question. Admission into evidence of tape recordings is a matter within the sound discretion of the trial court. *State* v. *Gotsis* (1984), 13 Ohio App. 3d 282, 283. To be admissible, the recordings must be authentic, accurate, and trustworthy. *Id.*

In the present case, the prosecution introduced tape recordings of two separate conversa-

tion between appellant and William and Sue Payton in which appellant admitted killing Martin and described in detail the nature and circumstances of the shooting. The court and counsel conducted an extensive *voir dire* of Larry Watson, the F. B. I. agent who procured the tapes, concerning the circumstances surrounding the recording and the methods employed. The contents of the tapes were thoroughly reviewed and defense counsel was given the opportunity to subject to any parts thereof. The tapes were then admitted in their entirety and selected portions were played in court. Under the circumstances, we find no abuse of discretion in the admission of the tapes.

Appellant's primary argument concerns the submission of the tapes to the jury. The record discloses, however, that appellant did not object to the tapes being sent to the jury room in their entirety. Further, even if error occurred, appellant incurred no prejudice. The trial court submitted the tapes but stated that it would not send the tape player to the jury room unless the jury specifically requested it. Upon reviewing record, we find no indication that such a request was made. Without a playback device the jury could not have reviewed the parts of the tapes that were not played in court. Appellant's third assignment of error is overruled.

### IV. and V.

In his fourth and fifth assignments of error, appellant asserts that he was denied effective assistance of counsel when trial court allowed the tape recordings to be submitted to the jury without objecting to a reference by appellant to his having killed before.[1] This argument is without merit.

It is well established that counsel's performance will not be deemed ineffective unless counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from the deficient representation. *Strickland* v. *Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052; *State* v. *Bradley* (1989), 42 Ohio St. 3d 136. Further, where the alleged deficiency "might be considered sound trial strategy," a reviewing court must indulge a strong presumption that counsel rendered adequate assistance. *Strickland, supra,* at 689, 104 S.Ct. at 2065.

In the case at bar, the trial court expressed concern about the prejudicial nature of the reference to appellant's having killed before. Defense counsel, however, after consulting with appellant, expressly indicated that he did not wish to

react the statement or request a cautionary instruction to the jury. Counsel indicated that such measures would not be good strategy because they might call undue attention to the statement. As the failure to object to the statement clearly represented a tactical decision in which appellant personally participated, we find no deficiency or prejudice in counsel's representation. *Id.* Appellant's fourth and fifth assignment of errors are overruled.

## VI.

For his sixth assignment of error, appellant contends that the trial court erred in refusing to allow appellant to argue first and last during the penalty phase, or, in the alternative, to limit the state's rebuttal argument and allow appellant to argue last.

The argument advanced by appellant was specifically addressed and rejected in *State v. Rogers* (1985), 17 Ohio St. 3d 174, paragraph six of the syllabus, reversed on other grounds (1987), 32 Ohio St. 3d 70. In *Rogers*, the Ohio Supreme Court recognized that while the burden of going forward at the penalty phase rests with the defendant, the burden of persuasion remains with the state, which must prove beyond a reasonable doubt that the aggravating circumstances the defendant was found guilty of committing outweigh the mitigating factors. R.C. 2929.03(D). Therefore, the court held that under R. C. 2945.10(F), which sets forth the order of proceedings in a criminal case, the state has the right to open and close arguments to the jury. The sixth assignment of error is overruled.

## VII.

Appellant next argues in his seventh assignment of error that he was denied equal protection, due process and the effective assistance of counsel because the state did not prosecute alleged co-conspirators, William and Sue Payton. This argument is wholly without merit.

It is axiomatic that the decision whether or not to prosecute and what charge to file or bring before the grand jury generally rests within the discretion of the prosecutor. *Bordenkircher v. Hayes* (1978), 434 U.S. 357, 364, 98 S.Ct. 663, 688. This discretion naturally entails the conscious exercise of some selectivity in enforcement. Such selectivity, however, is acceptable so long as the law is not "applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights * * *." *Yick Wo v. Hopkins*(1986), 118 U.S. 356, 373-374, 6 S.Ct. 1064, 1073. In Ohio, the applicable test was set forth in *State v. Flynt* (1980), 63 Ohio St. 2d 132:

"To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least *prima facie*, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, *i.e.*, based upon such impressible considerations as race, religion, or the desire to prevent his exercise of constitutional rights. These two essential elements are sometimes referred to as intentional and purposeful discrimination." *Id.* at 134, quoting *United States v. Berrios* (C.A.2, 1974), 501 F. 1207, 1211.

In applying the foregoing test,

"[a] mere showing that another person similarly situated was not prosecuted is not enough; a defendant must demonstrate actual discrimination due to invidious motives or bad faith. Intentional or purposeful discrimination will not be presumed from a showing of differing treatment." *States v. Freeman* (1985), 20 Ohio St. 3d 55, 58.

In the trial court, appellant's principal argument was that he was singled out for prosecution because he was allegedly a member of a satanic cult. The trial court rejected this argument for lack of factual support and appellant appears to have abandoned it in this court. Appellant now relies upon the alternative argument that the state chose to forego prosecution of the Paytons in order to deprive him of his discovery rights under Crim. R. 16. This argument is undermined, however, by the following sworn statement made by the prosecutor upon a special *voir dire* by the trial court:

"Q. Again, state your name and occupation.

"*A.* George E. Pattison, Prosecuting Attorney in Clermont County.

"*Q.* In reference to this case of state of Ohio versus Jerry R. Lawson and in reference to the two individual who have been discussed before, the Paytons, Susan and William S., I'm going to ask you the following question which you will answer under oath:

"Was the failure of the Clermont County Grand Jury to indict William S. Payton and Susan Payton for the offense or the offenses for which the defendant, Jerry Ray Lawson now stands indicted, the result of or motivated by an

intention of the Clermont County Prosecutor's Office to deprive the defendant, Jerry Ray Lawson, of items of discovery to which he might otherwise have been entitled if the Paytons had been indicted? Do you need that question repeated?"

"A. No. The answer is no."

In light of the foregoing testimony, we conclude that appellant has failed to established that the decision to prosecute him or to prosecute the Paytons was the result of arbitrary or discriminatory selection. Appellant's seventh assignment of error is overruled.

## VIII.

Appellant's eighth assignment of error alleges that the trial court erred in failing to order the state to disclose statements or notes taken during interviews with the Paytons or to review the statements or notes *in camera* for possible *Brady* material. This argument is without merit.

Prior to trial, defense counsel made several motions seeking disclosure of any statements given by the Paytons. The trial court ruled that statements by the Paytons were not discoverable pursuant to Crim. R. 16 because the Paytons were not co-defendants. Thereafter, defense counsel moved the trial court, pursuant to *Brady* v. *Maryland* (1963), 373 U.S. 83 S.Ct. 1194, to conduct an *in camera* inspection of any statements given by the Paytons in order to determine whether exculpatory or impeachment evidence was present.[2] The prosecution responded by indicating that it had reviewed its files and that no *Brady* material existed that had not been previously disclosed during discovery. The trial court ruled that in the face of such a denial by the prosecutor, it had no duty to conduct an *in camera* review of the prosecutor's files.

The issue of producing statements of the Paytons for *in camera* inspection was raised again at a hearing on February 1, 1988. At the time, the prosecutor stated that there was no written or recorded statements by the Paytons in its files. According to the prosecutor, the only undisclosed material regarding the Paytons was the prosecutor's personal notes from separate interviews with each of the Paytons. The prosecutor agreed to review those notes again and disclose any *Brady* material.

On February 10, 1988, the prosecutor stated in court that he had reviewed his notes and concluded that no *Brady* material was present. The prosecutor did, however, "in an abundance of caution," request an *ex parte* meeting with the trial judge and indicate that there were certain portions of the notes that he wanted the court to review *in camera* and determine whether those portions should be disclosed to defense counsel. The judge refused to discuss or examine the notes *ex parte* and indicated that any *in camera* inspection would have to be outside the presence of both counsel. The prosecutor then withdrew his request for an *in camera* inspection, but agree to seal the notes and preserve them for appellate review.

In *In Re Application of Storer Communications, Inc.*, (C.A.6, 1978), 828 F. 2d 330, the Sixth Circuit held that "when a prosecutor presents material to the court for a *Brady* determination, the court has an obligation to examine the material *in camera* and determine whether disclosure to the defense is required." *Id.* at 335. In the present case, however, the prosecutor did not voluntarily submit his notes to the court for *in camera* review. He merely requested an *ex parte* hearing to have the trial judge review portions of the notes "in an abundance of caution." As even the *Storer Communications* court noted, *"[e]x parte* proceedings, particularly in criminal cases, are contrary to the most basic concepts of American justice and should not be permitted except possibly in the most extraordinary cases involving national security." *Id.* at 335. This is not such a case. Therefore, the trial court properly refused to examine the materials *ex parte*.

Appellant also relies upon *Pennsylvania* v. *Ritchie* (1987), 480 U.S. 39, 107 S.Ct. 989, as authority requiring an *in camera* review by the trial court. In *Ritchie*, the defendant was charged with the rape of his thirteen-year-old daughter. During pretrial discovery, the defendant sought records from Children and Youth Services ("CYS"), a state agency charged with investigating cases of suspected mistreatment and neglect. However, the trial court refused to order disclosure of the CYS files or conduct an *in camera* review. The Pennsylvania Supreme remanded the case and ordered the trial court to review the files to determine the materiality of the contents under *Brady*. The United States Supreme Court affirmed.

Upon reviewing *Ritchie*, we note a critical distinction from the case at bar. In *Ritchie*, neither the court the prosecutor was aware of the contents of the CYS files. Therefore, there had never been a determination by legal authorities as to whether *Brady* material was present. In the instant case, however, the prosecution thoroughly reviewed its files and concluded that no *Brady* material was contained therein. Such a review

and representation by the prosecution is generally sufficient to satisfy *Brady*. *State* v. *Patterson* (1971), 28 Ohio St. 2d 181, 183, certiorari denied (1972), 409 U.S. 913, 93 S.Ct. 242. The Supreme Court even recognized this distinction in *Ritchie* when it stated:

"In the typical case where a defendant makes only a general request for exculpatory material under *Brady* v. *Maryland*, 373 U.S. 83, 83 S.Ct. 1194, it is the state that decides which information must be disclosed. Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final." *Ritchie, supra*, at ___, 107 S.Ct. at 1003 (footnote omitted).

Thus, "while the *Brady* rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." *United States* v. *Presser* (C.A. 6, 1988), 844 F. 2d 1275, 1281. After all, "[i]t is the duty of the prosecutor, not the court, to disclose exculpatory material." *Storer Communications, supra*, at 335. Accordingly, we find no error on the part of the trial court in refusing to conduct an *in camera* inspection.

The prosecutor's decision regarding the existence of *Brady* material is, of course, reviewable under the standards set forth in *United States* v. *Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375. To comply with *Brady*, the prosecutor need only disclose evidence that is both favorable to the accused and material to either guilt or punishment. *Id.* at 674, 105 S.Ct. at 3379. The key issue is the materiality of the evidence. In *Bagley*, the Supreme Court held that:

"[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley, supra*, at 682, 105 S.Ct. at 3383.

Further, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States* v. *Agurs* (1976), 427 U.S. 97, 109-110, 96 S.Ct. 2392, 2400. In other words, the prosecutor's failure to disclose does not amount to a constitutional violation unless the "omission is of sufficient signifi-cance to result in the denial of the defendant's right to a fair trial." *Id.* at 108, 96 S.Ct. at 2400.

We have reviewed the sealed materials and we find no violation of the *Brady* rule. The notes contain virtually no information favorable to appellant. Any information that might even remotely be considered favorable was disclosed or made available to the defense through other means. Accordingly, the notes could not have affected the outcome of the trial. In sum, we find that the sealed materials contain no information of sufficient probative value to be considered "material" under *Bagley, supra*. Appellant's eighth assignment of error is overruled.

IX.

Appellant's ninth assignment of error alleges that the trial court erred in denying appellant's post-trial motion to unseal the prosecutor's notes and allow defense counsel to examine them for purposes of making a *Brady* argument on appeal. This argument has no merit.

First, we have already determined that no *Brady* violation occurred and that the trial court did not err in refusing to examine the sealed materials. Second, the Supreme Court has repeatedly emphasized that *Brady* and its progeny did not create a constitutional right to discovery. See *Weatherford* v. *Bursey* (1977), 429 U.S. 545, 559, 97 S.Ct. 837, 846. As the court stated in *Ritchie, supra*:

"A defendant's right to discover exculpatory evidence does not include unsupervised authority to search through the Commonwealth's files. *** Although the eye of an advocate may be helpful to a defendant in ferreting out information, ***"

"this Court has never held--even in the absence of a statute restricting disclosure--that a defendant alone may make the determination as to the materiality of the information. * * * Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance." *Id.* at ___, 107 S.Ct. at 1003 (citations omitted).

Thus, even where the court has determined that an inspection of the materials is warranted, such inspection has been limited to the court only, not to defense counsel as requested here. *Id.* Appellant's ninth assignment of error is overruled.

X.

Appellant next contends that there was insufficient evidence from which the jury could find beyond a reasonable doubt that appellant

was the principal offender in the aggravated murder. We do not agree.

It is established that a reviewing court will not overturn a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. *State* v. *Eley* (1978), 56 Ohio St. 2d 169. In reviewing the legal sufficiency of the evidence, "the test is whether after viewing the probative evidence and inferences reasonably drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the offense beyond a reasonable doubt." *State* v. *Martin* (1983), 20 Ohio App. 3d 172, 175. In making this determination, it is the mind of the trier of fact, rather than the reviewing court, that must be convinced. *State* v. *Abi-Sarkis* (1988), 41 Ohio App. 3d 333, 337. Accordingly, the question of credibility and the weight to be accorded certain evidence are left to the trier of fact. *Id; Martin, supra.*

The principal offender in an aggravated murder case is generally considered to the "trigger man," or the individual who personally caused the death of the victim with the specific intent to kill. See *Brown, supra,* at 318; *State* v. *Penix* (1987), 32 Ohio St. 3d 369, 371; *Scott* v. *Perini* (C.A.6, 1981), 662 F. 2d 428, 433. In the case *sub judice* appellant stipulated that he shot and killed Martin. There was also overwhelming evidence of intent to kill, including appellant's taped statements, the manner in which death was inflicted, and the concealment of the body. See *State* v. *Edwards* (1985), 26 Ohio App. 3d 199, 200; *State* v. *Austin* (1976), 52 Ohio App. 2d 59, 68. Thus, the jury's finding that appellant was the principal offender is amply supported by the record. The tenth assignment of error is overruled.

## XI.

In his eleventh assignment of error, appellant advances several arguments challenging the constitutionality of Ohio's death penalty scheme. These arguments are raised primarily for the purposes of preserving them for further appellate review.

First, appellant asserts that the death penalty does not achieve a compelling state interest because it is totally without penological justification. This argument was rejected by the Ohio Supreme Court in *State* v. *Jenkins* (1984), 15 Ohio St. 3d 164, 168, certiorari denied (1985), 472 U.S. 1032 S.Ct. 3514, and is without merit.

Appellant next challenges the mandatory nature of R.C. 2929.03(D) (2) which requires the jury to recommend a sentence of death if it finds beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. This argument was rejected in *Jenkins, supra;* and *State* v. *Buell* (1986), 22 Ohio St. 3d 124, certiorari denied (1986), 479 U.S. 870, 107 S.Ct. 240. Moreover, a similar challenge to the death penalty statutes of Pennsylvania and California, which contain provisions similar to R.C. 2929.03(D)(2), was recently rejected by the United States Supreme Court in *Blystone* v. *Pennsylvania* (1990), ___ U.S. ___, 110 S. Ct. 1078 and *Boyde* v. *California* (1990) ___ U.S. ___, 110 S.Ct. 1190.

Appellant also claims that Ohio's death penalty scheme forecloses the extension of mercy by the jury. This argument was expressly rejected in *Jenkins, supra; Buell, supra;* and *State* v. *Bedford* (1988), 39 Ohio St. 3d 122, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1357.

Appellant further contends that Crim. R. 11(C)(3), which permits a trial court to dismiss death penalty specifications in the interest of justice when a defendant pleads guilty, is unconstitutional in that it encourages guilty pleas. This argument has no application to the instant case since appellant did not plead guilty. See *State* v. *Zuern* (1987), 32 Ohio St. 3d 56, 64, certiorari denied (1988), ___ U.S. ___, 108 S.Ct. 786. Moreover, the supreme court has held that Crim. R. 11(C)(3) provides sufficient guidance to the trial court's discretion and does not improperly encourage guilty pleas. *Buell, supra; State* v. *Van Hook* (1988), 39 Ohio St. 3d 256, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1578.

Finally, appellant argues that Ohio's capital punishment scheme unconstitutionally fails to provide adequate standards of review to juries, trial courts, and reviewing court. This argument was not raised in the court below. Nevertheless, we note that the supreme court has held that Ohio's death penalty statute provides adequate guidelines for the weighing and review process. *Buell, supra; State* v. *Glenn* (1986), 28 Ohio St. 3d 451, certiorari denied (1987), ___ U.S. ___, 107 S.Ct. 3219.

Whereas each of the foregoing constitutional arguments have been addressed and rejected by the Ohio Supreme Court, appellant's eleventh assignment of error is overruled.

## XII.

Appellant alleges in his twelfth assignment of error that the trial court erred in failing to

give his requested charge on reasonable doubt in the penalty phase. Appellant's proposed instruction read:

"Reasonable doubt is present when you're not firmly convinced that death is the appropriate punishment."

The Ohio Supreme Court has held that "[i]t is prejudicial error to refuse a requested charge that is pertinent to the case, states the law correctly, and is not covered by the general charge." *State* v. *Hicks* (1989), 43 Ohio St. 3d 72, 77, certiorari denied (1990), ___ U.S. ___, 110 S.Ct. 1502. The court has also indicated, however, that trial courts "should limit definitions, where possible, to those definitions provided by the legislature * * *." *State* v. *Williams* (1988), 38 Ohio St. 3d 346, 356, note 14, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1176.

In the present case, the trial court instructed the jury on reasonable doubt according to the definition set forth in R.C. 2901.05(D). The court did, however, delete certain language which appellant found objectionable.[3] Thus, while the court did not accept appellant's proposed modification of R.C. 2901.05(D), it did address appellant's concerns with using the standard reasonable doubt instruction in the penalty phase of a capital trial. Under such circumstances, we find no prejudicial error in the court's instructions Appellant's twelfth assignment of error is overruled.

### XIII. and XIV.

Appellant's thirteenth and fourteenth assignments of error challenge the kidnapping specifications to the aggravated murder charges. Essentially, appellant argues that there was no separate animus for the kidnapping and murder, and therefore a conviction on both charges is precluded by R.C. 2941.25. This argument is without merit.

Under R.C. 2941.25, a defendant may be convicted and sentenced for two or more offenses, having as their genesis the same criminal conduct or transaction, provided that the offenses (1) were not allied and of similar import, (2) were committed separately, or (3) were committed with a separate animus as to each offense. *State* v. *Moss* (1982), 69 Ohio St. 2d 515, 519, certiorari denied (1983), 459 U.S. 1200, 103 S.Ct. 1183. In *State* v. *Logan* (1979), 60 Ohio St. 2d 126, the supreme court applied R.C. 2941.25 to a charge of kidnapping and stated:

"In establishing whether kidnapping and another offense of the same or similar kind are committed with a separate animus as to each

pursuant to R.C. 2941.25(B), this court adopts the following guidelines:

"(a) Where the restraint or movement of the victim is merely incidental to a separate underlying crime, there exists no separate animus sufficient to sustain separate convictions; however, where the restraint is prolonged, the confinement is secretive, or the movement is substantial so as to demonstrate a significance independent of the other offense, there exists a separate animus as to each offense sufficient to support separate convictions;

"(b) Where the asportation or restraint of the victim subjects the victim to a substantial increase in risk of harm separate and apart from that involved in the underlying crime, there exists a separate animus as to each offense sufficient to support separate convictions." *Id.*, syllabus.

Additionally, in the recent case of *State* v. *Powell* (1990), 49 Ohio St. 3d 255, at 261, the court held that "[w]here murder is the underlying crime, a kidnapping in facilitation thereof would generally constitute a separately cognizable offense."

Upon reviewing the facts at bar, we find that the significant movement and restraint by deception of the victim were not intrinsic to his murder. The prolonged deception over several hours was not incidental to the killing and clearly constituted a separate and distinct act which aggravated the circumstances of Martin's death. See *Buell, supra,* at 141-142. Accordingly, appellant's thirteenth and fourteenth assignments of error are overruled.

In his final assignment of error, appellant asserts that he was prejudiced by the state's failure to record the grand jury proceedings. We do not agree.

In *State* v. *Grewell* (1989), 45 Ohio St. 3d 4, the supreme court held that grand jury proceedings in felony cases must be recorded pursuant to Crim. R. 22. It is undisputed that the grand jury proceedings below were not recorded. Accordingly, there was error. Such error, however, is not prejudicial *per se.* As the court noted in *Grewell,*

"grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." *Id.* at 9, quoting *State* v. *Patterson* (1971), 28 Ohio St. 2d 181, paragraph three of the syllabus. Thus, the failure to record the grand

jury proceedings may constitute harmless error where the defendant fails to demonstrate a particularized need for the transcripts *Grewell, supra,* at 9.

"Whether particularized need for disclosure of grand jury testimony is shown is a question of fact; but, generally, it is shown where from a consideration of all the surrounding circumstances it is probable that the failure to disclose the testimony will deprive the defendant of a fair adjudication * * *." *State* v. *Greer* (1981), 66 Ohio St. 2d 139, paragraph three of the syllabus. This determination rests within the sound discretion of the trial court. *Grewell, supra,* at 9.

In support of a particularized need, appellant simply reiterates his previous arguments concerning the availability of statements or testimony of William Payton. The prosecutor represented to the court below, however, that Payton did not testify before the grand jury. As appellant has set forth no other argument demonstrating a particularized need for disclosure, his claim of prejudice must fail. Accordingly, we find the failure to record the grand jury proceedings to be harmless error. *Grewell, supra.* Appellant's fifteenth assignment of error is overruled.

## XVI.

Having addressed each of appellant's assignments of error and finding them to be without merit, it now becomes the duty of this court, pursuant to R.C. 2929.05, to independently weigh all of the facts and other evidence disclosed in the record, consider the offense and the offender, and determine whether the aggravating circumstances which appellant was found guilty of committing outweigh the mitigating factors in the case.

The jury found appellant guilty of the following aggravating circumstances under R.C. 2929.04(A):

"* * *

"(3) The offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender.

"* * *

"(7) The offense was committed while the offender was committing, attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping, * * * and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design.

"(8) The victim of the aggravated murder was a witness to an offense who was purposely killed to prevent his testimony in any criminal proceeding and the aggravated murder was not committed during the commission, attempted commission, or flight immediately after the commission or attempted commission of the offense to which the victim was a witness, or the victim of the aggravated murder was a witness to an offense and was purposely killed in retaliation for his testimony in any criminal proceeding."

The record overwhelmingly demonstrates that appellant kidnapped Martin by deception, then purposely and with prior calculation and design, killed him in retaliation for his grand jury testimony and to escape punishment for the residential burglaries and other criminal activities with which appellant had been implicated. Accordingly, we are satisfied that each of the foregoing aggravating circumstances was amply supported by the evidence and proved beyond a reasonable doubt.

Against these aggravating circumstances we are required, under R.C. 2929.04(B), to consider and weigh the nature and circumstances of the offense, the history, character, and background of appellant, and all of the following factors:

"(1) Whether the victim of the offense induced or facilitated it;

"(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;

"(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;

"(4) The youth of the offender;

"(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

"(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

"(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."

Considering first appellant's history, character and background, we note that the record shows appellant to be a man of low intellect who suffers from a low self-esteem. He was placed in classes for slow learners in school, but dropped out when he was in the eleventh grade. Appellant left home at seventeen and essentially

became a drifter, working sporadically and living with various friends and family, usually for short durations. At the mitigation hearing, acquaintances described appellant as an insecure person who was anxious to please others and attempted to do so by exaggerating his accomplishments.

At twenty-five years of age, appellant was convicted of breaking and entering and sent to the Mansfield Reformatory. He was subsequently transferred to Lebanon Correctional Institution where he remained incarcerated until he was paroled in August 1974. In January 1976, appellant was again convicted of breaking and entering. He was sent to London Correctional Institution, where he served until March 1977. Upon being released from London, appellant lived primarily with his sister until 1980, when he took his infant daughter, born out of wedlock, and moved to New Mexico. While in New Mexico, appellant was convicted of harboring or aiding a felon and sentenced to eighteen months in the state penitentiary. He was paroled in July 1984 and returned to Ohio. However, the return to Ohio constituted a violation of appellant's parole and he was extradited back to New Mexico to complete his sentence. After appellant was released in September 1985, he again returned to Ohio where he lived with various female acquaintances until his arrest on the current charges in 1987. During his intermittent incarcerations, appellant received numerous disciplinary write-ups and was described as having an "unsatisfactory institutional adjustment."

The record further reveals an extensive history of alcohol and drug abuse, including the use of valium, marijuana, cocaine and LSD. There is also some evidence to indicate that appellant was sexually abused by a relative as a teen. Psychological tests indicated that appellant had an IQ of eighty-one, felt alienated socially, and reacted impulsively to stress. Appellant was also described as being very close to and protective of his family. Finally, a clinical psychologist, Dr. David Chiappone, testified that given the right combination of circumstances appellant could kill again.

Turning to the specific mitigating factors outlined in R.C. 2929.04(B), we find no evidence to indicate that the victim induced or facilitated his own demise, or that appellant was under duress, coercion, or strong provocation. Although appellant was of low intellectual and low self-esteem, there is no persuasive evidence that he suffered from a mental disease or defect or that he lacked substantial capacity to appreciate the

criminality of his conduct or to conform his conduct to the requirements of the law. Appellant was thirty-four years old at the time of the offense and had a significant criminal record. Additionally, the evidence overwhelmingly demonstrated that appellant was the principal offender in the aggravated murder, the circumstances of which offer nothing in mitigation.

In considering the foregoing evidence, we find that the aggravating circumstances of this case strike at the core of our system of criminal justice. When a witness is purposely kidnapped and killed in retaliation for past or pending testimony, the entire system breaks down. Accordingly, upon reviewing the entire record and balancing the aggravating circumstances and mitigating factors, and considering the vicious and brutal nature of the offense, it is not difficult for this court to conclude that the aggravating circumstances which appellant was found guilty of committing outweigh the mitigating factors in the case beyond a reasonable doubt.

## XVII.

Finally, R.C. 2929.05 requires that this court determine whether appellant's sentence of death is appropriate. In making this determination, we must consider whether the sentence is excessive or disproportionate to the penalty imposed in similar cases within the geographical jurisdiction of this court. *Rogers, supra; Steffen, supra.*

This court has previously considered only three cases in which the death penalty was imposed. The first was *State v. Davis* (May 27, 1986), Butler App. No. CA84-06-071, unreported. The defendant's death sentence in that case was affirmed by this court, but subsequently vacated by the Ohio Supreme Court. See *State v. Davis* (1988), 38 Ohio St. 3d 361. Consequently, we cannot use *Davis* for comparative purposes.

The other two death penalty cases reviewed by this court were *State v. DePew* (June 29, 1987), Butler App. No. CA85-07-075, unreported, affirmed (1988), 38 Ohio St. 3d 275, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1099 and *State v. Watson* (Mar. 31, 1989), Butler App. No. CA88-02-014, unreported. In *DePew,* the defendant was sentenced to death for repeatedly stabbing three people during the commission of aggravated burglary, then setting fire to the premises to conceal evidence of the offense. In *Watson,* the defendant was sentenced to death for shooting a Hamilton, Ohio store owner in the head with a twelve-gauge shotgun during the commission of an aggravated robbery.

In comparing the facts and circumstances of *DePew* and *Watson* with the instant case, we cannot say that appellant's sentence of death is excessive or disproportionate. This conclusion is supported by Ohio Supreme Court cases in which a death sentence was found to be appropriate when the aggravated murder was committed with similar aggravating circumstances. *Buell,* supra (kidnapping), *Stumpf, supra* (escaping detection); *State* v. *Jester* (1987), 32 Ohio St. 3d 147, certiorari denied (1988), ___ U.S. ___, 108 S.Ct. 785 (escaping detection); *State* v. *Morales* (1987), 32 Ohio St. 3d 252, certiorari denied (1988), ___ U.S. ___, 108 S.Ct. 785 (kidnapping); *Brown, supra* (escaping detection); *State* v. *Hooks* (1988), 39 Ohio St. 3d 67, certiorari denied (1989), ___ U.S. ___, 109 S.Ct. 1657 (escaping detection, victim was witness); *State* v. *Benner* (1988), 40 Ohio St. 3d 301 (kidnapping); *State* v. *Roe* (1989), 41 Ohio St. 3d 18, certiorari denied (1990), ___ U.S. ___, ___ S.Ct. ___ (kidnapping); *State* v. *Coleman* (1989), 45 Ohio St. 3d 298 (escaping detection); *State* v. *Brewer* (1990), 48 Ohio St. 3d 50 (kidnapping, escaping detection). Accordingly, we find the sentence of death in the instant case to be appropriate.

*Judgment affirmed.*

JONES, P.J., KOEHLER and YOUNG, JJ., concur.

---

[1] During the taped conversation with William Payton, appellant stated:

"Lawson: Number one is this, man, he fucked, he fucked you around, your sister around, the kids around, alot of people around him he fucked, my little brother around, my sister, he tried, tryin' to fuck me around you (inaudible) ... that shit don't go, not with me, you know. I've killed before man, but everytime I've killed, man, you see how I looked, man I turned fuckin white, man, fucking start sweating and shit, felt sick.

"Payton: No, you turn into wild man. (Laughter)

"Lawson: Hey, I can psych myself out now. I can psych myself out, man, that's I've been down that road quite a few times (inaudible) whatever (inaudible discussion)."

[2] In *Brady, supra,* the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to quit or punishment, irrespective of the good faith or bad faith of the prosecution." *Id* at 87, 83 S.Ct. at 1196-1197.

[3] R.C. 2901.05(D) states:

"(D) 'Reasonable doubt' *is present when the jurors, after they have carefully considered and compared all the evidence, cannot say they are firmly convinced of the truth of the charge. It* is a doubt based on reason and common sense. Reasonable doubt is not mere possible doubt, because everything relating to human affairs or depending on moral evidence is open to some possible or imaginary doubt. 'Proof beyond a reasonable doubt' is proof of such character than an ordinary person would be willing to rely and act upon it in the most important of his own affairs." (Emphasis added.)

The trial court's penalty phase instruction mirrored this definition with the underlined portion being omitted.